Filed 10/27/15  P. v. Ngov CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B253584 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA090593) |
| v. | |
| MATTHEW NGOV, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James B. Pierce, Judge.  Reversed and remanded.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyoshi and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Matthew Ngov, whose first trial ended in a hung jury, appeals from the judgment entered following his conviction by a second jury of first degree murder and related felonies arising from the drive-by shooting of Pablo Ortiz. Ngov, whose DNA was found at the crime scene, contends the evidence was insufficient to establish he was present when Ortiz was murdered and his convictions were obtained as a result of judicial bias, prosecutorial misconduct and the ineffective assistance of his counsel. We agree it is reasonably probable the jury would have returned a more favorable verdict for Ngov but for the trial court's improper intervention preventing the introduction by defense counsel of statements made by Ngov when accused of the crime, evidence that had been allowed at the first trial. Accordingly, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Information*

Ngov was charged by information with first degree murder (Pen. Code, § 187, subd. (a));[1] shooting from a motor vehicle (§ 12034, subd. (c)); and unlawful possession of a firearm (§ 12021, subd. (a)(1)). As to the first two counts it was specially alleged Ngov had personally and intentionally discharged a firearm resulting in great bodily injury or death (§ 12022.53, subds. (b)-(d)). The information also charged all three counts had been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).[2]

2. *The People's Evidence*

At 7:32 p.m. on June 21, 2011 security cameras attached to a house near the intersection of 14th Street and Dawson Avenue in Long Beach captured footage of a dark gray Lexus sedan driving through the neighborhood. As the car turned from Dawson Avenue onto 14th Street, an arm extended from the car's rear passenger window and

---

[1]    Statutory references are to this code unless otherwise indicated.

[2]    For simplicity on occasion this opinion uses the shorthand phrase "to benefit a criminal street gang" to refer to crimes that, in the statutory language, are committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1); see *People v. Jones* (2009) 47 Cal.4th 566, 571, fn. 2.)

dropped a white cup onto the pavement. A minute later, the car returned and again drove slowly along 14th Street. What appeared to be the same arm, holding a handgun, extended again from the rear passenger window and fired several shots at Ortiz, who was riding a bicycle on the street next to the car.[3]

Officers from the Long Beach Police Department responded to the shooting, located the footage from the surveillance cameras and isolated a white plastic Subway cup near the corner of Dawson Avenue and 14th Street that resembled the cup dropped from the car. The cup had fallen on its side with the straw still attached to the lid. Long Beach Police Officer Alfonso Garcia was directed to recover the cup. He testified the cup contained some liquid, including some melting ice, which he poured on the ground, before placing the cup in an evidence bag. Although he also noticed condensation on the cup, he did not mention the ice inside the cup or the condensation on the outside of the cup in his report.

Ngov, a member of the Asian Boyz gang, was arrested two months later in connection with an unrelated investigation, and his DNA was found to match that recovered from the straw of the Subway cup. After receiving the DNA results Detective Peter Lackovic questioned Ngov.

The prosecutor elicited the following description of a portion of Lackovic's interrogation:

"[Prosecutor]: Did you confront Mr. Ngov about the evidence that you had in this case?

"[Detective]: Yes.

"[Prosecutor]: What specifically did you confront him with?

"[Detective]: He was aware of why he was there. He was shown a picture of the suspect car. He was given a generic description of where the crime occurred.

"[Prosecutor]: Did you confront him about DNA?

"[Detective]: Yes.

---

[3] Ortiz was struck by three bullets and died from his wounds.

"[Prosecutor]:  When you confronted him about DNA, did you show him anything?

"[Detective]:  Yes.  I showed him a report from the Los Angeles Sheriff's Department crime lab that showed that his DNA was recovered from the crime scene.  [¶] . . . [¶]

"[Prosecutor]:  Did you also tell him that there were witnesses?

"[Detective]:  Yes.  I did.

"[Prosecutor]:  And were there witnesses?

"[Detective]:  There were not eyewitnesses.  No.

"[Prosecutor]:  There were no eyewitnesses, but you told the defendant there were witnesses.  Correct?

"[Detective]:  I take it back.  There were eyewitnesses to the shooting.  There were no eyewitnesses that identified anybody.

"[Prosecutor]:  Thank you for that clarification.  Why did you tell the defendant there [were] eyewitnesses that may be able to identify him, or did identify him?

"[Detective]:  During the interview of the defendant, it's a common ruse that we'll use to tell him that there may be particular evidence one way or another as part of the interview of him."

Following the interrogation Ngov was placed in a cell with another Asian Boyz gang member, Barry Prak; and their conversation was recorded.  After complaining to each other about Lackovic, Prak asked Ngov if "that was your first?"  Ngov answered, "Yeah"; and Prak told him about his own "first," when his "shit" had jammed.  Ngov responded, "That was my first time.  The first time, the first time something fucked up on me, and the last time."  Ngov also told Prak the shooting occurred on 14th Street and St. Louis (Avenue), a block from Dawson Avenue, a detail made important by Lackovic's omission of the cross-street during his interrogation.  Ngov later stated, "They got me that I'm close as fuck with Knuckles," the owner of the suspect car and a member of the Suicidal Town Crips, a gang affiliated with Asian Boyz.

4

A forensics expert testified the straw contained a mixture of DNA from a major profile and a minor profile. The major profile matched Ngov's, with a random match probability estimated as one out of one septillion ($10^{24}$). The expert did not test any portion of the cup other than the straw. She acknowledged that DNA can last for some time when deposited on a surface. Another forensic expert testified she had lifted a latent print off the side of the cup toward the bottom. The print had been made on the cup when it was dry and had not later become wet.

Officer Richard Solorio testified as an expert on the Asian Boyz street gang. Ngov had previously admitted to the officer he was a member of the Asian Boyz gang, which has an alliance with the Suicidal Town Crips. The area where the shooting occurred is claimed by the Asian Boyz. When presented with a hypothetical containing the facts of the case, Officer Solorio opined the shooting had been committed to benefit the Asian Boyz gang.

3. *The Defense's Evidence*

On the afternoon of June 21, 2011 Ngov and his girlfriend, Jasmyn Fajardo, went to Home Depot in Lakewood to buy an air conditioner. Fajardo used her debit card to purchase the air conditioner at 6:48 p.m. Fajardo testified they were in the store for 30 minutes and had their cell phones with them. As they were walking to the car, Ngov decided to return to get a drink. Using his debit card, he purchased a soda at 6:56 p.m.[4] After returning to Ngov's house, they discovered the unit did not work and at 8:08 p.m called the customer service number on the box to report the problem.[5]

Ngov testified on his own behalf and admitted he had prior convictions for sale of a controlled substance and gun possession. Ngov identified the Lexus shown in the surveillance footage as the one belonging to his friend Knuckles. He had been in the car

---

[4] An employee of Home Depot testified about the purchases based on receipts linked to Fajardo's and Ngov's separate debit cards.

[5] Fajardo testified at an earlier proceeding she had spent the entire day with Ngov. She was impeached with cell phone records showing they had called and texted each other earlier in the day. She revised her testimony to say they had been together for about 90 minutes before driving to Home Depot.

before the June 21, 2011 shooting but was not there on that evening. Attempting to explain the presence of his DNA on the cup, Ngov stated he believed someone else threw out a cup he had used on a previous occasion in Knuckles's car. He also believed Knuckles likely shot Ortiz. Ngov testified his jail cell conversation with Prak referred to the first time he had handled a gun when he was 16 and had been caught by the police. Ngov also believed Prak was talking about his first time handling a gun when it jammed.

The defense called a cell phone expert who plotted the towers used by Ngov's phone between 6:45 and 8:00 p.m. on June 21, 2011. Ngov made no calls during this time but his phone initiated an 88-minute data connection with the tower northeast of his home at 7:20 p.m. Fajardo's phone connected to the cell tower near Home Depot between 6:47 p.m. and 6:50 p.m. and then connected to the tower near Ngov's home at 7:20 p.m. At the time of the shooting Ngov's carrier, T-Mobile, had a range of one and one-half miles. The defense also called a fingerprint expert who testified Ngov's palm and fingerprints did not match the latent print found on the Subway cup. A second forensic identification expert concurred with the People's expert the print had been placed on the cup when it was dry and would have deteriorated if exposed to liquid.

4. *The People's Rebuttal Evidence*

In their rebuttal case the People called the defense fingerprint expert and questioned him further about the print found on the cup. He reaffirmed his opinion the print had been placed on the cup when it was dry and stated the print would have shown signs of the presence of any condensation after the print had been made: "There's no moisture on there before or after the latent print was developed."

The People also called Detective Lackovic to testify about the time it took to drive from Ngov's home to the crime scene. The detective testified he drove about six times along different routes around the same time of day and the trips averaged approximately 11 minutes.[6]

---

[6]     We deny Ngov's request to take judicial notice of MapQuest.com estimates the time to drive between his house and the murder site along various routes required between 19 and 21 minutes. We grant his request, however, to the extent the maps reflect

5. *The Verdict and Sentencing*

The jury convicted Ngov on all three counts and found true the firearm and gang enhancements. He was sentenced to an aggregate state prison term of 57 years to life.

**DISCUSSION**

1. *The Trial Court's Intrusion into Defense Counsel's Cross-examination Violated Ngov's Right to a Fair Trial*

a. *Governing law*

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. [Citation.] The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. [Citation.] At the same time, it preserves both the appearance and reality of fairness, 'generating the feeling, so important to a popular government, that justice has been done,' [citation] by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." (*Marshall v. Jerrico, Inc.* (1980) 446 U.S. 238, 242 [100 S.Ct. 1610, 64 L.Ed.2d 182]; see *Caperton v. A.T. Massey Coal Co., Inc.* (2009) 556 U.S. 868, 876 [129 S.Ct. 2252, 173 L.Ed.2d 1208]; *Bracy v. Gramley* (1997) 520 U.S. 899, 904-905 [117 S.Ct. 1793, 138 L.Ed.2d 97].)

"The trial court has a statutory duty to control trial proceedings, including the introduction and exclusion of evidence. [Citation.] As provided by section 1044, it is 'the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters,

the distance between the two geographical locations by surface streets (7.1 miles) and freeway (9.4 miles). (See Evid. Code, §§ 452, subd. (h), 459, subd. (c); *Colberg, Inc. v. State of California* (1967) 67 Cal.2d 408, 423; *City of Anaheim v. Workers' Comp. Appeals Bd.* (1981) 116 Cal.App.3d 248, 261.)

with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.' However, 'a judge should be careful not to throw the weight of his [or her] judicial position into a case, either for or against the defendant.'" (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237 (*Sturm*); accord, *People v. Harris* (2005) 37 Cal.4th 310, 346-347.)

In reviewing a claim of judicial error in this regard, our role is to determine whether the court's actions, whether or not undertaken in bad faith, denied the defendant a fair trial. (*People v. Cook* (2006) 39 Cal.4th 566, 598; see *People v. Snow* (2003) 30 Cal.4th 43, 78 [role of reviewing court "'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid, [but] . . . whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial'"].)

b. *The judge's conduct*

Ngov contends the trial court's sua sponte exclusion of exculpatory evidence and the related intimidating discussion between the court and his counsel in front of the jury, as well as a second acrimonious exchange between court and counsel during the examination of a defense witness, demonstrate improper judicial intervention and bias toward his counsel that denied him a fair trial.[7] Ngov's argument focuses principally on the court's intervention when his counsel attempted to elicit testimony from Detective Lackovic describing Ngov's reactions during Lackovic's interrogation, a line of questioning the court had permitted at Ngov's first trial:

"[Defense counsel]: You asked him to try to prove—to show you that he was not at the [site of the shooting] during that time. Correct?

"[Detective]: Yes, sir.

---

[7]    The People contend Ngov forfeited this contention by failing to object to the judge's conduct or move for his recusal. Ngov may have forfeited any argument he had for statutory recusal (see Code Civ. Proc., § 170.3), but he has not forfeited his constitutional claim. (See *People v. Chatman* (2006) 38 Cal.4th 344, 363; *People v. Brown* (1993) 6 Cal.4th 322, 335; *People v. Panah* (2005) 35 Cal.4th 395, 445, fn. 16.)

8

"[Defense counsel]: You asked him to try to remember where . . . he may have been that day?

"[Detective]: Asked him where he was. I asked him if he has alibis to tell us.

"[Defense counsel]: This was in November. Correct?

"[Detective]: I believe so. Yes.

"[Defense counsel]: Did he have an alibi off the top of his head?

"[The court]: You're asking him for hearsay. You can't do that.

"[Defense counsel]: From defense—

"[The court]: It's called an admission. And only a party opponent can introduce an admission. A party proponent cannot. Please, counsel, I don't want to argue and teach you the law. You know the law. And as soon as I said it, you recognized it. So please don't argue with me when I make a ruling.

"[Defense counsel]: I am not arguing, Your Honor. I'm sorry.

"[The court]: You said a party admission. And it's not a party admission. You can't introduce a party admission. You understand that.

"[Defense counsel]: Goes to impeach the statement, too. That's fine, Your Honor.

"[The court]: You're arguing again.

"[Defense counsel]: I'll submit on that.

"[The court]: Next question. Please. No impermissible questions.

"[Defense counsel]: During the interview, were you able to get information based on that?

"[The court]: Counsel, you're asking for hearsay. Any information is hearsay. It's coming from your client. You can't introduce hearsay of your client. The other side can. But you can't. You know the rules. Please. Next question.

"[Defense counsel]: Now, you believe that those—part of those audio recording[s]—strike that, please.

"[The court]: I'm not interested in his beliefs."

9

At that juncture Ngov's counsel abandoned this line of questioning. Consequently, the jury never heard testimony relating to Ngov's reaction to the detective's accusation he had been identified as the shooter.[8]

---

[8]    At Ngov's first trial his counsel was allowed to elicit the following testimony from the detective:

"[Defense counsel]:  You told [Ngov] multiple people pointed him out doing the shooting.  Didn't you?

"[Detective]:  That's quite possible.

"[Defense counsel]:  And his demeanor when you were telling him this, he got upset with you.  Didn't he?

"[Detective]:  His demeanor changed throughout the conversations that we had with him.

"[Defense counsel]:  Well—but he got upset with you and told you to do your job. Didn't he?

"[Detective]:  That was one of the things he told me.  Yes, sir.

"[Defense counsel]:  He told you to keep looking and get evidence.  Didn't he?

"[Detective]:  He did.

"[Defense counsel]:  He told you, 'Do your job, man.  Blow it up.  Blow up the video.'  Right?

"[Detective]:  Yes, sir.

"[Defense counsel]:  And you told him that's the least of your concerns.  Right?

"[Detective]:  Yes, sir.

"[Defense counsel]:  And he said, 'I know it's not me.  And hopefully a jury will. Do your job'—

"[Prosecutor]:  Objection.  Hearsay.

"[The court]:  No.  I'll allow it.

"[Defense counsel]:  He said, 'I know it's not me.  Hopefully a jury will.  Do your job, man.  Blow it up.  Blow up the video.'  [¶] . . . [¶]

"[Detective]:  He made lots of statements, sir.  Some complete lies.  Some statements like that.

"[Defense counsel]:  But he did say that.  Didn't he?

"[Detective]:  That's one of the statements he made.  Yes, sir.

10

In the second instance the court chastised Ngov's counsel after Fajardo twice referred to the previous trial during her testimony. The prosecutor asked for a sidebar, and the court excused the jury:

"[Prosecutor]: . . . I'm not sure if, outside the presence of the jury, if [Fajardo] had been admonished or asked to refrain from using the term 'prior trial.' . . . If that hasn't been done, I would ask counsel to speak with her, perhaps have her use 'hearing' or some other word.

"[Defense counsel]: I think we've spoken briefly. I didn't emphasize that today. I should have repeated that before we came in.

"[The court]: It seemed like the answer to every question is around the last trial.

"[Defense counsel]: Sorry.

"[The court]: It's happened more than once . . . .

"[Defense counsel]: I think the detective already testified to the existence of a previous trial.

"[The court]: So therefore what? You're going to have every witness thereafter say the same thing over and over and over and over again . . . ? What do you mean by the answer, 'The detective already said it'? Therefore what?

"[Defense counsel]: I don't think the jury is prejudiced by it. And—

"[The court]: So you're going to have to have him repeat it over every single witness that you call. Is that what you are saying? You seem to be saying that, justifying it by saying if . . . a wrong has been committed, I can commit wrongs as many times as I want. Is that what you are saying to me?

"[Defense counsel]: No, sir. I think there's nothing in our past, Judge, for you to assume that. Now, first—

"[The court]: Well, you gave the answer, 'The detective already raised it.' Therefore I can do whatever I want?

"[Defense counsel]: And he said, 'Please find more evidence. Keep looking for evidence.' Correct?

"[Detective]: That sounds correct. Yes, sir."

"[Defense counsel]:  No, sir.  I think that is unfair to say.

"[The court]:  Okay.

"[Defense counsel]:  Unfair assumption.

"[The court]:  Well, that seems to be what you're saying.  Otherwise, what does it mean?  What does it mean the detective already said it?"

Defense counsel then voiced his belief Fajardo's references to the first trial had not been unduly prejudicial and explained he had instructed her the previous week not to mention the earlier trial but had forgotten to reinforce that admonition before she testified.  He also pointed out he had successfully avoided the issue with other witnesses and objected to the court's insinuation he was trying to elicit improper references to the prior trial from Fajardo.  The court turned to Fajardo and asked whether she recalled such a conversation:

"[The court]:  Ms. Fajardo, do you remember that conversation?

"[Ms. Fajardo]:  I do.

"[The court]:  And you're going to ignore that conversation?

"[The witness]:  I forgot about it.

"[The court]:  Oh. You forgot about it?  Do you remember the rest of the conversation that he said?  And have you forgotten everything that he said to you?  [¶] . . . [¶]

"[Defense counsel]:  Does the court feel there is a prejudice based on her statement?

"[The court]:  It doesn't really matter what I think about it [counsel].

"[Defense counsel]:  Is there a legal issue here?

"[The court]:  Yes.  There is.  It's improper to keep mentioning that in front of the jury.

"[Defense counsel]:  That's fair.  And I think . . . at this point we can remind her.

"[The court]:  You want me to ring the bell again?  Tell the jurors to disregard it, what's already been rung twice now?

"[Defense counsel]:  That's what I'm asking the court.  [¶] . . . [¶]

12

"[The court]: You want me to do that? Is that what you're asking?

"[Defense counsel]: I'm asking what the court is trying to do.

"[The court]: I'm not planning on doing anything.

"[Defense counsel]: That's fine.

"[The court]: Because I got a feeling no matter what I said, it's going to be ignored or forgotten anyways, either by the witness or counsel.

"[Defense counsel]: I don't think that's fair, your honor."

"[The court]: I know you don't think it is. I don't think what you're doing is fair either. Does that matter?

"[Defense counsel]: Yes.

"[The court]: It does?

"[Defense counsel]: Again, [we've had] cases here together. I think it's unfair to imply that upon me. I don't think I've done anything in our past to support that type of insinuation.

"[The court]: Well, we'll see if the witness can abide by the rules from here on out and see if she'll remember. Let's hope she does."

c. *The judge's intimidation of defense counsel unduly prejudiced Ngov*

Ordinarily, a single instance of improper judicial conduct in front of the jury is not sufficient to demonstrate judicial bias that has deprived a defendant of a fair trial. (See, e.g., *People v. Banks* (2014) 59 Cal.4th 1113, 1175-1176 ["[t]he only comment the court made in front of (prospective) jurors was the remark that proceedings had been delayed one morning because of a 'problem obtaining the presence of the defendant in a timely fashion'"]; *People v. Houston* (2012) 54 Cal.4th 1186, 1221 ["[e]ven if improper . . . two brief remarks '"fall short of the intemperate or biased judicial conduct [that] warrants reversal"'"]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1107 ["[a] trial court commits misconduct if it 'persists in making discourteous and disparaging remarks to a defendant's counsel . . . and utters frequent comment from which the jury may plainly perceive that the testimony of the witness is not believed by the judge, and in other ways discredits the cause of the defense'"].) In *Sturm, supra*, 37 Cal.4th 1218, for instance, the

13

Supreme Court reversed a conviction due to the trial court's pervasive misconduct, including the "belittle[ment of] defense witnesses on several occasions" (*id.* at p. 1233), "repeatedly answer[ing] questions (once incorrectly) for a defense witness" (*id.* at p. 1239), "disparage[ing] defense counsel" on multiple occasions (*id.* at p. 1234) and "interpos[ing] [its] own objections to questions asked by defense counsel" on "numerous occasions" (*id.* at p. 1235).[9] (See also *People v. Santana, supra,* 80 Cal.App.4th at p. 1207 [trial court asked extensive questions of defense witnesses and belabored points of evidence adverse to Santana taking "on the role of prosecutor rather than that of an impartial judge"].) Moreover, "'a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review.'" (*People v. Pearson* (2013) 56 Cal.4th 393, 447.)

Although we are concerned here with a single incident of improper judicial intervention, the court's actions were particularly egregious under the circumstances, usurping the prosecutor's role, disparaging defense counsel's abilities and improperly excluding exculpatory evidence.[10] Defense counsel was attempting to elicit Detective Lackovic's description of Ngov's reaction to Lackovic's statements during his interrogation that Ngov's DNA had been found at the crime scene and that he had been identified as the shooter by several unidentified eyewitnesses. This same testimony had been admitted at the previous trial—over which the same judge had presided—despite a belated hearsay objection by the same prosecutor. In other words, the judge, the lawyers and the witness all knew where defense counsel's questions were headed. Nonetheless,

---

[9]   In *Sturm* the trial court told defense counsel "the line of questioning was '"going nowhere"' and counsel was '"not grasping my ruling,"' accused counsel of '"trying to sneak [forbidden questions] by,"' referred to the '"inordinate amount of time whereby objections are raised with regard to questions by [defense counsel],"' and described counsel to the jury as having '"supposedly learn[ed] the rules of evidence"' in law school." (*People v. Banks, supra,* 59 Cal.4th at p. 1176.)

[10]   We do not separately address the second episode in which the court chastised defense counsel and Fajardo about her two references to the earlier trial. The tenor of the court's comments, however, underscores the court's hostility toward the defendant and his counsel.

14

without waiting for an objection from the prosecutor, the court interrupted with a ruling excluding the testimony, a lecture in open court about hearsay rules and a warning not to argue the point when counsel attempted to state a ground under which the testimony would be admissible. Heeding the court's manifest determination to block this testimony, Ngov's counsel ultimately abandoned his effort to introduce Ngov's responses or to assert any other basis for their admission.[11]

In fact, the question that prompted the court to interject its evidentiary ruling—whether Ngov had offered an alibi off the top of his head—called for a simple yes or no response and, based on the detective's testimony from the first trial, would have been answered in the negative. As such, it was not hearsay at all. Moreover, the answers to this line of questioning, again based on Detective Lackovic's testimony at the first trial, were admissible under Evidence Code section 356's rule of completeness.

Evidence Code section 356 provides, "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . when a . . . conversation . . . is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." Evidence Code section 356 "is founded not on reliability but on fairness so that one party may not use 'selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.'" (*People v. Parrish* (2007) 152 Cal.App.4th 263, 273.) "'"In applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry. 'In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or

---

11    When counsel does not complain or object that evidentiary rulings reflect judicial bias, the party forfeits the claim on appeal. (*People v. Pearson*, supra, 56 Cal.4th at p. 447; *People v. Snow, supra,* 30 Cal.4th at pp. 77-78.) One exception to this general rule is when objecting would be futile. (See *Sturm, supra,* 37 Cal.4th at p. 1237 [finding it would have been futile for defendant to raise with the judge his derogatory comments and objections where it could cause the judge to be more negative toward defendant in front of the jury].)

written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with,* the admission or declaration in evidence.'"'" (*People v. Harris*, *supra,* 37 Cal.4th at pp. 334-335; accord, *Parrish,* at p. 274; see *People v. Williams* (1975) 13 Cal.3d 559, 564-565 [testimony properly admitted pursuant to Evidence Code section 356 not subject to hearsay objection]; see also *People v. Vines* (2011) 51 Cal.4th 830, 862 [rejecting Sixth Amendment confrontation clause challenge to testimony introduced by the People "under the hearsay exception embodied in Evidence Code section 356"].)

In this case, the prosecutor asked Detective Lackovic foundational questions about his interrogation of Ngov that were intended to portray Ngov as concerned his involvement in the murder of Ortiz was already known to police and that the People then used to explain Ngov's recorded jail cell conversation with fellow gang member Prak. Lackovic testified he showed Ngov a photograph of the car and told him he had been identified as the shooter in a drive-by murder on 14th Street in June 2011. He also told Ngov his DNA had been found at the scene. The prosecutor then introduced the recorded conversation in which Ngov said, "that was my first time . . . the first time something fucked up on me," as well as "[t]hey got me that I'm close as fuck with Knuckles." The prosecutor argued those statements were acknowledgement of Ngov's culpability for the Ortiz murder. In addition, on the tape Ngov is heard saying the shooting occurred on 14th Street and "St. Louis." Lackovic subsequently testified he had not told Ngov where on 14th Street the shooting had occurred.[12]

If defense counsel had been permitted to ask the same questions as had Ngov's prior counsel at the first trial, Detective Lackovic would have been compelled to testify that, although Ngov did not offer an alibi, he repeatedly asserted his innocence and told

---

[12]     The emphasis placed on this evidence by the People does not seem to be warranted. Ngov testified he read about the murder in the newspapers and knew a $10,000 reward had been offered, presumably for information leading to a conviction. The defense introduced evidence the Los Angeles Times identified the location of the murder as the 2100 block of 14th Street, the block between St. Louis and Dawson Avenues.

Lackovic to do his job, "blow up the video" and keep looking for more evidence.[13]
Fairness required that defense counsel be permitted to inquire about those statements.
Relying on Evidence Code section 356 courts routinely allow prosecutors to introduce
additional statements made by defendants in such circumstances. (See, e.g., *People v.
Vines, supra,* 51 Cal.4th at p. 861 ["the prosecution was entitled under Evidence Code
section 356 to introduce the portion of the statement describing defendant's participation
in the offense if the defense introduce the portion describing [a third person's]
participation"]; *People v. Wharton* (1991) 53 Cal.3d 522, 592-593 [under § 356, when the
defendant elicited evidence showing his culpability in a favorable light, the prosecution
was entitled to rebut that inference with evidence from the entire conversation to place
the defendant's evidence in context].) Absent these responses, Ngov's statements to
Prak—set up by Lackovic's accusations during the interrogation—became far more
incriminating. (See *Vines,* at p. 861 ["fairness is served, not thwarted, by the admission
of portions of a statement needed to make other portions not misleading"]; *People v.
Parrish, supra,* 152 Cal.App.4th at pp. 273-273 ["reliability of the evidence is not a
factor in determining admissibility under the rule of completeness—indeed, the evidence
proffered by the defendant and the prosecution may both be unreliable"].)[14]

---

[13] Ngov's statements to Detective Lackovic to "blow up the video," "do your job"
and "keep looking for evidence," although not offered for the truth of the matter asserted,
constitute "implied hearsay" assertions by Ngov of his innocence. (See *People v. Garcia*
(2008) 168 Cal.App.4th 261, 289 [although "[r]equests and words of direction generally
do not constitute hearsay," "'[e]vidence of an express statement of a declarant is . . .
hearsay evidence if such evidence is offered to prove—not the truth of the matter that is
stated in such statement expressly—but the truth of a matter that is stated in such
statement by implication'"].) Even separate from Evidence Code section 356, Ngov's
implied assertions of his innocence during the interrogation would have been admissible
after he testified in his own defense under Evidence Code sections 1236 and 791,
subdivision (a), as prior consistent statements made before the allegedly incriminating
(and inconsistent) statements he made to Prak in the jail cell.

[14] That Ngov's previously admitted statements were made to Prak in a separate
conversation does not remove his responses to Detective Lackovic from the ambit of
Evidence Code section 356. Lackovic was allowed to testify broadly about the
interrogation to provide a needed context for the statements Ngov made to Prak. As the

While we are reluctant to second-guess the intentions of trial judges, it is apparent the court here, having heard Detective Lackovic's testimony at the first trial, which ended in a hung jury, determined this evidence should not be admitted and acted, improperly, to exclude it even before the prosecutor could perform his assigned role. Seen in this light, the court abandoned its role as a neutral and impartial arbiter of justice. In doing so, it committed an error of constitutional dimension by placing its "thumb . . . on the scales of justice, tilting the balance in the state's favor . . . ." (*People v. Gammage* (1992) 2 Cal.4th 693, 705 (conc. opn. Mosk, J.); see also *People v. Cowan* (2010) 50 Cal.4th 401, 457 ["[A] constitutionally intolerable probability of actual bias exists only when the circumstances "'would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused."' [Citation.] This inquiry is an objective one, based on whether "'under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias and prejudgment that the practice must be forbidden."'"].)

In these circumstances, in which the principal defense was one of identity and the evidence contradictory, we cannot conclude the error was harmless, whether prejudice is evaluated under the standard for state law or federal constitutional error.[15] (See *People v.*

---

Supreme Court has repeatedly explained, "'[t]he purpose of Evidence Code section 356 is to avoid creating a misleading impression.'" (*People v. Chism* (2014) 58 Cal.4th 1266, 1324; see *People v. Harris, supra,* 37 Cal.4th at pp. 334-335 ["'[i]n the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have some *bearing upon, or connection with,* the admission or declaration in evidence'"].)

[15] Evidence Code section 354 prohibits the reversal of a judgment because of the erroneous exclusion of evidence "unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice *and* it appears of record that: [¶] (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means; [¶] (b) The rulings of the court made compliance with subdivision (a) futile; or [¶] (c) The evidence was sought by questions

*Watson* (1956) 46 Cal.2d 818, 836; *People v. Pearson*, *supra*, 56 Cal.4th at p. 463 ["'[t]he beyond-a-reasonable-doubt standard of *Chapman* [*v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705]] "require[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"'"].)  Ngov's statements to Prak constituted the People's only corroboration of the chief evidence against him—his DNA on the straw of a cup.  That he offered a detailed alibi, corroborated independently by credit card receipts and cell phone records, as well as a plausible reason for the cup's presence in Knuckles's car, distinguishes this case from those in which a court's similar conduct might be found harmless.  Moreover, confronted with the same evidence but allowed to hear Ngov's response to Detective Lackovic, a different jury was unable to reach a verdict.  In light of these facts, it is reasonably probable a result more favorable to Ngov would have been reached had that testimony been allowed.  Accordingly, his convictions must be reversed.[16]

       2. *The Verdicts Were Supported by Substantial Evidence*

       "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding."  (*Burks v. United States* (1978) 437 U.S. 1, 11 [98 S.Ct. 2141, 57 L.Ed.2d 1].)  To avoid placing a defendant in double jeopardy, a reviewing court that reverses a conviction due to legal error must assess the defendant's challenges to the sufficiency of the evidence to determine whether the defendant may be retried for some or all of the offenses.  (See *People v. Morgan* (2007) 42 Cal.4th 593, 613; *People v. Hayes* (1990) 52 Cal.3d 577, 631.)  "[T]he defendant . . . may preserve for himself whatever double jeopardy benefits accrued in his first trial notwithstanding some fatal

---

asked during cross-examination or recross-examination."  The circumstances here satisfy all of these elements.

[16]    Based on our finding of prejudicial error requiring reversal, we need not discuss the additional grounds of prosecutorial misconduct and ineffective assistance of counsel raised by Ngov.

19

defect in the proceedings." (*People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 72, fn. 14.)

Although we conclude the exclusion of Ngov's statements to Detective Lackovic requires reversal of his convictions in this exceptionally close case, there was substantial evidence that supported the jury's verdict including the discovery of Ngov's DNA on the cup and his incriminating statements to Prak. Ngov contends, however, citing *Mikes v. Borg* (9th Cir. 1991) 947 F.2d 353, that a conviction resting solely upon fingerprint or DNA evidence is infirm as a matter of law. In *Mikes* the Ninth Circuit found the mere existence of the defendant's fingerprints on the murder weapon, a turnstile post discovered at the crime scene, was insufficient evidence to infer he was the murderer, absent other circumstantial evidence. (*Id.* at pp. 357-358.) Prior to the murder, the turnstile posts had been offered for sale (as part of a used turnstile) in a hardware store where they were accessible to the general public. (*Id.* at p. 358.) The victim had purchased the used turnstile and stored it in the basement of his fix-it-shop, which became the scene of the crime. (*Id.* at p. 355.) The *Mikes* court concluded, "[I]n fingerprint-only cases in which the prosecution's theory is based on the premise that the defendant handled certain objects *while committing the crime in question,* the record must contain sufficient evidence from which the trier of fact could reasonably infer that the fingerprints were in fact impressed at that time and not at some earlier date." (*Id.* at pp. 356-357.)

To be sure, California courts have overturned convictions for insufficient evidence when the sole evidence tying the defendant to the crime is biological evidence (fingerprints or DNA) found on items to which the defendant had access prior to the crime. (See, e.g., *People v. Trevino* (1985) 39 Cal.3d 667, 696-697, disapproved on other grounds in *People v. Johnson* (1989) 47 Cal.3d 1194 [fingerprint on dresser drawer insufficient where defendant stayed in home with the dresser prior to the charged murder].) But, "under California law," fingerprints and DNA are viewed as "strong evidence of identity and ordinarily are sufficient, without more, to identify the perpetrator of a crime"—particularly when the item or place touched was not something to which the defendant had access prior

to the crime. (*People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1076 [defendant's fingerprints sufficient to infer guilt of burglary when discovered on a vase in a model home that had been regularly cleaned and had not been accessible to the general public for more than six months]; see also *People v. Figueroa* (1992) 2 Cal.App.4th 1584, 1588 [palm prints on window that was point of entry for burglary sufficient where no evidence defendant had been near window before]; *People v. Preciado* (1991) 233 Cal.App.3d 1244, 1247 [fingerprints on wristwatch box sufficient where no evidence defendant had access to the box].)

We need not decide whether the DNA evidence in this case, standing alone, could support Ngov's convictions.[17] The additional evidence here distinguishes this case from *Mikes* and the others discussed. Because substantial evidence supported the verdicts, therefore, Ngov is subject to retrial on the charges against him.

---

[17] The existence of Ngov's DNA on the straw is compelling and, coupled with Ngov's statements to Prak, more than adequate to constitute substantial evidence for purpose of appellate review. Nonetheless, the evidence Ngov used the cup mere minutes before the shooting is contradictory. According to the People, the presence of bits of "melting ice" in the cup and condensation on the outside of the cup (as testified to by Officer Garcia) proves Ngov sipped the drink through the straw immediately before the shooting. However, the latent print found on the lower portion of the cup did not belong to Ngov according to the defense expert; and the fingerprint experts from both sides agreed that print was made when the outside of the cup was dry and was not later exposed to moisture, testimony inconsistent with the assertion there was ice in the cup when it was retrieved by the police.

## DISPOSITION

The judgment is reversed and the matter remanded for retrial.

PERLUSS, P. J.

We concur:

ZELON, J.

BECKLOFF, J.[*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.